# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

BRUCE A. HIVELY,

                     **CASE NO. 2:17-CV-222**

    **Petitioner,**              **JUDGE JAMES L. GRAHAM**

                     **Magistrate Judge Kimberly A. Jolson**

    v.

WARDEN, MARION
CORRECTIONAL INSTITUTION,

    **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the court on the Petition, Respondent's Return of Writ, Petitioner's Reply, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the Petition be **DENIED** and this action be **DISMISSED.**

## I.    FACTS AND PROCEDURAL HISTORY

The Ohio Fourth District Court of Appeals summarized the facts and procedural history of the case as follows:

> On April 10, 2013, Bruce A. Hively ("Hively") was indicted on one count of Murder, a first degree felony, in violation of R.C. 2903.02(A), one count of Aggravated Murder, a first degree felony, in violation of R.C. 2903.01(A), and one count of Tampering with Evidence, a third degree felony, in violation of R.C. 2921.12(A)(2). The charges stemmed from the death of Charles T. Addis ("Addis") that occurred on April 4, 2013. Hively shot and killed Addis after an altercation involving Hively, Addis, Addis's older brother Aaron Addis, and Addis's friend Anthony Kyle Knepper ("Knepper").
>
> At trial, the state presented a total of 11 witnesses including Aaron Addis and Knepper. The evidence admitted at trial included two cell phone recorded videos taken by Knepper that captured a portion of the April 4, 2013 altercation and the moment the

shooting occurred. The state also admitted a video of an interview between Hively and two agents of the Bureau of Criminal Identification and Investigation ("BCI").

The record reveals the following facts. During the afternoon of April 4, 2013, Hively was on his way home after checking property he owned in the area when he drove past Dickey Chapel Church on Elliot Road in Gallia County. As he drove by the church, he noticed three men, Addis, Knepper, and Aaron Addis in the church parking lot. Hively stopped at the intersection of Hannan Trace Road, which ran perpendicular to Elliot Road. The church parking is located to the right of Elliot Road as one approaches Hannan Trace Road. Hively was worried that the men saw him leaving. In his interview with Agent Trout, Hively stated that the men had a history of threatening and harassing him. Hively believed that when three of "them" were siting at the church, they were up to no good. In the interview Hively declared that he was "tired of this," so he decided to turn around.

According to Knepper's testimony, Hively's vehicle was stopped for "about two or three minutes," before Hively turned his vehicle around and headed back on Elliot Road. Hively stopped his vehicle on the side of Elliot Road nearest the church parking lot. Between the church parking lot and Elliot Road is a small embankment that slopes towards the road. Hively rolled his window down and yelled at the men. At trial both Knepper and Aaron Addis testified that Hively rolled down his window and waved his pistol out the window. They also testified that Hively said that he had all three of them now, and asked which one wants to go first.

At some point, Knepper took out his phone and began to record the altercation. The recording provides both video and audio coverage. On two separate occasions during the recording, only audio is provided because the phone's video had been obstructed. Aaron Addis remained sitting inside his vehicle parked at the top of the embankment for the entirety of the altercation except when the shooting occurred. Aaron Addis's voice was heard on the recording only a few times. The voices most predominantly featured on the recording were those of Hively and Knepper.

The first recording began with Hively getting out of his vehicle as Knepper and Addis walk down the embankment towards him. Without transcribing the entire video, it is clearly shown that the three men each issued their own threats and taunts. Both Addis and Knepper come face to face with Hively, with Hively holding up his fists each time. Addis told Hively to "Let's step out here," pointing

to an area away from the vehicle. Hively can be heard saying to Knepper: "I slapped you once boy." Knepper stated to Hively that he would knock his lights out; Knepper also made reference to a 12 gauge and that he had " * * * killed fucking bigger pieces of shit than your fucking ass." After approximately seventy seconds of constant back and forth yelling and taunting, the situation slightly calmed down. The video recording became obstructed for the rest of the first video because Knepper put his phone, with the camera still recording, in his pocket. Hively explained his suspicions regarding the thefts of his property. Addis and Knepper maintained that they had nothing to do with it. Aaron Addis can be heard telling Hively that he was tired of him (Hively) coming up there and running his mouth. The last statement on the first video is from Knepper stating: "Don't be pulling a god damn gun."

The second video began by showing Addis and Hively standing a few feet away from one another with Knepper on the left side of Addis. Hively was standing just outside the driver's seat of the vehicle with the door open. The open door was somewhat between Hively and Knepper but not between Hively and Addis. Knepper and Addis then talked about Hively holding a gun behind his back. Knepper insisted the gun was in Hively's right hand tucked behind his back. Hively asked where the gun was and shows his left empty hand. Then the following exchange between Hively and Addis occurs, briefly on video:

Hively: "What was you going for?"

Addis: "What?"

Hively: "Dick sucker, what was you going for?"

Then Knepper turned the video away from Hively and Addis and back towards the embankment. Seconds pass when the audio captured two gunshots. The audio on the recording then became primarily the emotional outbursts of Knepper and Aaron Addis. However, the recording briefly displayed Addis on the ground, writhing in pain, with Hively standing over top of him. Hively still had the gun pointed at Addis. As the video again turned away from Hivley and Addis, another gunshot can be heard. The video ended as Knepper and Aaron Addis run from the scene, retreating to a nearby cemetery.

Sometime after these events, Amanda Nibert ("Nibert"), a corrections officer for the Gallia County Sheriff's office, who was heading home on Hannan Trace Road, turned onto Elliott Road

and saw a man motionless on the road beside Hively's white Kia. Nibert saw Hively in the church parking lot. Nibert testified that Hively had blood running down his left wrist and a red mark on his left cheekbone. Nibert asked Hively if he needed help, to which Hively responded that three boys had jumped him, he warned them to leave him alone and that he would shoot them. Hively also told Nibert that "Charlie had a knife and had cut his left wrist and that they stomped him with their boots." Nibert called 911 and advised them of the situation. Nibert also testified that Knepper and Aaron Addis returned to the scene. Nibert informed them that the sheriff had been called and that there did not need to be any more trouble.

The state also questioned Nibert about the cell phone reception in the area:

[Prosecutor]: Okay. And um, to your knowledge is cell phone reception kind of sparse throughout that area?

[Nibert]: Yes.

[Prosecutor]: And uh, have you ever went to that church parking lot to use the cell phone reception?

[Nibert]: Yes.

[Prosecutor]: Okay. And explain to me why you would go there?

[Nibert]: Um, just if you want to send a text message. There are only a few places that you can. It either has to be at the top of my driveway, my window or the church.

BCI Agent Shane Hanshaw processed the scene of the shooting. He located four spent shell casings. One casing was found in front of the vehicle. A second was found near the driver side door. The third and fourth casings were found near Addis's body. Agent Hanshaw also found a small knife in the open position near the upper torso of the back of Addis's body. It is also notable that on cross-examination, Agent Hanshaw testified that he took "several" swabs of blood evidence from the front driver's side interior door of Hively's car. Agent Hanshaw released those swabs to the Sherriff's office. Agent Hanshaw testified that it was not his decision to determine what evidence would be submitted to BCI for testing.

Later in the trial, the state called Deputy Nathan Harvey to testify. On cross-examination, defense counsel asked about the blood

swabs from the interior of the driver side door. Deputy Harvey stated that the swabs were not submitted to the lab for testing. Deputy Harvey explained that the swabs were not submitted because the lab has a limit on the number of items that can be submitted. The swabs were not submitted "Based on the fact that he [Hively] admitted to cutting his own hand ..." and they were " * * * not as important as other items."

BCI Agents Mike Trout and John Jenkins interviewed Hively after the shooting. Before speaking with the BCI agents, Hively signed a waiver of his Miranda rights. Video footage of the interview was shown during the trial. During the interview, Hively told Agent Trout about his history with Addis, Knepper and Aaron Addis. Hively stated that Addis did not like him because Hively had complained about Addis's riding his four wheeler down the street. Hively stated that when the boys were at the church they "were up to no good." Worried that the men had seen him when he initially drove by the church, Hively stated that he turned his car around and told the men that they should not be up there.

During the interview, Hively asked Agent Trout if he had found his knife. Hively explained that he used the knife in his fist to make his fist solid. When Knepper and Addis came down the embankment, Hively stated that he placed the gun in the passenger seat before exiting the vehicle. At this point, Hively explained that he was "gonna whoop Charlie and get it over with." Hively maintained that he grabbed his gun and came up firing in response to Knepper pushing Hively back against the car and Addis kicking him in the face. Hively admitted to emptying the clip; but insisted that he was pushed back into his car.

Prior to interviewing Hively, Agent Trout viewed the video captured on Knepper's cell phone. Agent Trout testified at trial that: "I didn't see anything, um, in uh, Mr. Hively's hand. I didn't see the knife that was in his hand that he referenced." Towards the end of the interview, Agent Trout revealed to Hively that Knepper was in fact recording video of the incident. Hively admitted that at one point he held the gun down to his side, but he put the gun back in the car. After a few more questions, Hively admitted that he cut himself with his knife and that he placed the knife near Addis. Hively stated that he did that so " * * * there was no question of me that they done that to me." Although Agent Trout questioned Hively's story relating to being pushed back into the car, Hively maintained that the gun was in the car; he was pushed back into the car; and he grabbed the gun and fired at Addis.

The physician who performed the autopsy on Addis identified, both at trial and on his reports, several gunshot wounds. The wounds included two graze gunshot wounds involving the nose and right eyebrow, a gunshot wound with an entry and exit wound on the chin, two distant range gunshot wounds of the chest, both of which lacerated Addis's heart, and an intermediate range wound of the left wrist. The coroner explained that a distance range wound is a range greater than twenty-four inches. The coroner testified the intermediate wrist wound had a range of six to twenty-four inches. He concluded: "no fewer than four [gunshots] caused the injuries on [Addis]. He also stated that it "may have been as many as five or six, depending on if the gunshot wound through the wrist then re-entered either in the chest or one of the graze injuries of the um, face."

The jury found Hively not guilty of the first count of Murder, guilty of the second count of Aggravated Murder with a gun specification and guilty of count three, Tampering with Evidence. The trial court sentenced Hively to thirty years imprisonment for count two, and additional three years for the gun specification to be served consecutively, and thirty months imprisonment for count three to be served concurrently. Hively then filed this timely appeal.

*State v. Hively*, No. 13CA15, 2015 WL 3745609, at *1–4 (Ohio Ct. App. June 8, 2015).

Petitioner asserted on appeal that the trial court erred by denying his request for a "castle doctrine jury instruction" and that his aggravated murder conviction was against the manifest weight of the evidence. The appellate court affirmed, *id.*, and, on October 28, 2015, the Supreme Court of Ohio declined to accept jurisdiction of the appeal. *State v. Hively*, 143 Ohio St.3d 1501 (Ohio 2015).

On August 25, 2015, Petitioner filed an application to reopen the appeal pursuant to Ohio Appellate Rule 26(B). (Doc. 6-1, PageID# 200). Petitioner asserted that he was denied the effective assistance of appellate counsel because his attorney failed to raise on appeal the following claims: inconsistent jury verdicts, improper denial of his motion for a change of venue, and denial of the effective assistance of trial counsel based on his attorney's failure to

introduce photographs of the injuries he sustained during the incident that resulted in Addis's death, failure to introduce into evidence prior police reports, failure to introduce a written statement from the State Fire Marshal about three arsons that had been committed by the victim's family and friends after his arrest but prior to trial, and failure to object to the trial court's acceptance of a guilty verdict on aggravated murder after the jury found him not guilty of murder. On November 25, 2015, the appellate court denied the Rule 26(B) application. (*Id.*, PageID# 213). On March 9, 2016, the Supreme Court of Ohio declined to accept jurisdiction of that appeal. *State v. Hively*, 145 Ohio St.3d 1411 (Ohio 2016).

Petitioner then filed this *pro se* Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He asserts that he was denied the effective assistance of trial counsel (claim one); that he was denied a fair trial when the trial court refused to grant his motion for a change of venue (claim two); that he was denied due process based on inconsistent jury verdicts (claim three); that the evidence is constitutionally insufficient to sustain his conviction on aggravated murder and that his conviction on aggravated murder was against the manifest weight of the evidence (claim four); and that he was denied a fair trial because the trial court refused to issue a "castle doctrine" jury instruction (claim five). Respondent argues that Petitioner's claims are procedurally defaulted or are otherwise meritless.

## II.    STANDARD OF REVIEW

Petitioner seeks habeas relief under 28 U.S.C. § 2254. The Antiterrorism and Effective Death Penalty Act ("AEDPA") sets forth the standards governing this Court's review of state-court determinations. The United States Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and has emphasized that courts must not "lightly conclude that a State's criminal justice system

has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, ⸺ U.S. ⸺, ⸺, 134 S.Ct. 10, 16 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt." (internal quotation marks, citations, and footnote omitted)).

Further, the factual findings of the state appellate court are presumed to be correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1)

Thus, "[u]nder AEDPA, a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)). The United States Court of Appeals for the Sixth Circuit has explained these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent

to a new context. *Id.* at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Coley*, 706 F.3d at 748–49. The burden of satisfying the standards set forth in § 2254 rests with the petitioner. *Cullen v. Pinholster*, 563 U.S.170, 181 (2011).

In addition to the high standard a federal habeas petitioner must overcome on the merits, he must also clear certain procedural hurdles. In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). If the prisoner fails to do so, but still has an avenue open to present the claims, then the petition is subject to dismissal for failure to exhaust state remedies. *Id.*; *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (*per curiam*) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)). Where a petitioner has failed to exhaust claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

The term "procedural default" has come to describe the situation where a person convicted of a crime in a state court fails (for whatever reason) to present a particular claim to the highest court of the State so that the State has a fair chance to correct any errors made in the course of the trial or the appeal before a federal court intervenes in the state criminal process. This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review." *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)). One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted. That means

that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court do so. As the Supreme Court found in *Wainwright v. Sykes*, "contentions of federal law which were not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case—that is, they are "procedurally defaulted." 33 U.S. 72, 87 (1977).

## III. DISCUSSION

As noted, Respondent argues that all of Petitioner's claims are procedurally defaulted or meritless.

### A. Claims One, Two, and Three (Procedural Default)[1]

In claim one, Petitioner asserts that he was unconstitutionally denied assistance of trial counsel; and, in claim two, he claims that he was denied a fair trial when the trial court refused to grant his motion for a change of venue. His third claim asserts that the jury verdict in this case was unconstitutionally inconsistent. The record shows that Petitioner raised none of these claims on direct appeal. (*See* Doc. 6-1. Exs. 6, 11). Respondent thus argues, among other things, that these claims are procedurally defaulted. Petitioner seems to respond that he raised these claims in his timely 26(B) application and, because the state court reviewed the claims via that application, the claims are not procedurally defaulted.

The Sixth Circuit, however, has rejected Petitioner's argument. *See, e.g.*, *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008). To be clear, the basis of Petitioner's 26(B) application was ineffective assistance of *appellate* counsel because "[b]y its very nature, a Rule 26(B) application is a claim of ineffective assistance of appellate counsel." *Id.* at 312.

---

[1] Respondent makes additional arguments why claims one, two, and three fail. However, because the Court finds the claims procedurally defaulted, the additional arguments will not be considered.

Importantly, "bringing an ineffective assistance of appellate counsel claim does not preserve an underlying claim for federal review because the two claims are analytically distinct." *Davie v. Mitchell,* 547 F.3d 297, 312 (6th Cir. 2008) (quotation marks and citation omitted). Accordingly, claims one, two, and three were only underlying the appellate counsel claim in Petitioner's 26(B) application. And the Sixth Circuit expressly noted in *Davie* that while "any review of an ineffective assistance of counsel claim will likely include some sort of determination that the substantive claims underlying the assignment of error," a "Rule 26(B) application does not, given the comity and federalism concerns implicated in habeas cases, justify reaching the merits of that claim." *Id.* at 313. Thus, Petitioner's 26(B) application did not sufficiently preserve these claims, and the Court thus must determine whether the claims are procedurally defaulted.

### 1. *The* Maupin *Factors*

As explained above, where a petitioner has failed to exhaust claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas," and a petition is subject to dismissal. *Coleman*, 501 U.S. at 735 n.1. Courts in the Sixth Circuit engage in a four-part test to determine whether procedural default bars a habeas petitioner's claim. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also Scuba v. Brigano*, 259 F. App'x 713, 718 (6th Cir. 2007) (following the four-part analysis of *Maupin*). First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. Second, the court must determine whether the state courts actually enforced the state procedural sanction. Third, the court must determine whether the forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Maupin*, 785 F.2d at 138. Finally, if "the court determines that a state procedural rule was not complied with and

that the rule [has] an adequate and independent state ground, then the petitioner" may still obtain review of his or her claims on the merits if the petitioner establishes: (1) cause sufficient to excuse the default and (2) that he was actually prejudiced by the alleged constitutional error. *Id.*

Here, Petitioner failed to present claim one, claim two, or claim three to the state appellate courts on direct appeal. And, importantly, he may now no longer present these claims to the state courts by virtue of the application of Ohio's doctrine of *res judicata. See State v. Perry*, 10 Ohio St.2d 175 (1967) (holding that claims must be raised on direct appeal, if possible, or they will be barred by the doctrine of *res judicata*); *see also State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail*, 67 Ohio St.2d 16 (1981). Ohio courts have consistently refused, in reliance on the doctrine of *res judicata*, to review the merits of procedurally barred claims. *See Cole*, 443 N.E.2d at 170–71; *Ishmail*, 423 N.E.2d at 1070. Additionally, the Sixth Circuit has held that Ohio's doctrine of *res judicata* is an independent and adequate ground for denying federal habeas relief. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d 417, 427–29 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000); *Byrd v. Collins*, 209 F.3d 486, 521–22 (6th Cir. 2000); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998). Finally, with respect to the last *Maupin* factor (the independence prong), the Court concludes that Ohio's doctrine of *res judicata* in this context does not rely on or otherwise implicate federal law. Accordingly, the Court is satisfied from its own review of relevant case law that *res judicata* rule articulated in *Perry* is an adequate and independent ground for denying relief, and the *Maupin* factors are satisfied.

### 2. *Cause and Prejudice*

Petitioner may, however, still secure review of these claims on the merits if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice

from the constitutional violations that he alleges. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[,] '...some objective factor external to the defense [that] impeded...efforts to comply with the State's procedural rule.'" *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). It is Petitioner's burden to show cause and prejudice. *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001). A petitioner's *pro se* status, ignorance of the law, or ignorance of procedural requirements are insufficient bases to excuse a procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004). Instead, in order to establish cause, a petitioner "must present a substantial reason that is external to himself and cannot be fairly attributed to him." *Hartman v. Bagley*, 492 F.3d 347, 358 (6th Cir. 2007).

a. Ineffective Assistance of Counsel

Although not entirely clear, it seems that Petitioner asserts the denial of the effective assistance of counsel as cause for his procedural default. Because his ineffective assistance of trial counsel claim is procedurally defaulted, he may not use that claim as a vehicle to overcome the default itself. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (holding that an ineffective assistance of counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted).

As for his ineffective assistance of appellate counsel claim, the state appellate court considered this argument in the context of Petitioner's 26(B) application and found it meritless. Entry Denying Application to Reopen Direct Appeal (Doc. 6-1, PageID# 225–28). Relevant here, the Sixth Circuit, unlike some other courts, has not applied AEDPA deference in this situation. "An argument that ineffective assistance of counsel should excuse a procedural default is treated differently than a free-standing claim of ineffective assistance of counsel. The latter

must meet the higher AEDPA standard of review, while the former need not." *Hall v. Vasbinder, 5*63 F.3d 222, 236–37 (6th Cir. 2009) (citations omitted). Consequently, the Court reviews the assertion of ineffective assistance of appellate counsel *de novo*.

In all criminal prosecutions, the Sixth Amendment affords "the accused . . . the right . . . to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The United States Supreme Court set forth the legal principles governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 556 (1984). A petitioner who claims the ineffective assistance of counsel must demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. *Id.* at 687; *Hale v. Davis*, 512 F. App'x. 516, 520 (6th Cir. 2013). A petitioner "show[s] deficient performance by counsel by demonstrating 'that counsel's representation fell below an objective standard of reasonableness.'" *Poole v. MacLaren*, 547 F. App'x 749, 754 (6th Cir. 2013) (quoting *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) and citing *Strickland*, 466 U.S. at 687). To make such a showing, a petitioner must overcome the strong presumption that his counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 689.

> The *Strickland* test applies to appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285, (2000); *Burger v. Kemp*, 483 U.S. 776 (1987). . . . Counsel's failure to raise an issue on appeal amounts to ineffective assistance only if a reasonable probability exists that inclusion of the issue would have changed the result of the appeal. *Id*. citing Wilson.... The attorney need not advance every argument, regardless of merit, urged by the appellant. *Jones v. Barnes*, 463 U.S. 745, 751–752 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." 463 U.S. 751–52).

*Leonard v. Warden, Ohio State Penitentiary*, No. 1:09-cv-056, 2013 WL 831727, at *28 (S.D. Ohio Mar. 6, 2013). Factors to be considered in determining whether a defendant has been denied the effective assistance of appellate counsel include:

> (1) Were the omitted issues "significant and obvious"?
>
> (2) Was there arguably contrary authority on the omitted issues?
>
> (3) Were the omitted issues clearly stronger than those presented?
>
> (4) Were the omitted issues objected to at trial?
>
> (5) Were the trial court's rulings subject to deference on appeal?
>
> (6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
>
> (7) What was appellate counsel's level of experience and expertise?
>
> (8) Did the petitioner and appellate counsel meet and go over possible issues?
>
> (9) Is there evidence that counsel reviewed all the facts?
>
> (10) Were the omitted issues dealt with in other assignments of error?
>
> (11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle*, 171 F.3d 408, 427–28 (6th Cir. 1999) (citations omitted).

After reviewing *de novo* the state appellate court's analysis of this issue, the Court agrees with its conclusion. Petitioner cannot satisfy *Strickland*'s standards, and, consequently, cannot excuse his procedural default based on ineffective assistance of appellate counsel.

b. Actual Innocence

The last potential escape hatch for Petitioner is a claim of actual innocence. The United States Supreme Court has held that such a claim may be raised "to avoid a procedural bar to the

consideration of the merits of [the petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray*, 477 U.S. at 496. In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to authorize a federal court in reaching the merits of an otherwise procedurally-barred habeas petition. *Schlup*, 513 U.S. at 317. The actual innocence exception allows a petitioner to pursue his constitutional claims if it is "more likely than not" that new evidence—not previously presented at trial—would allow no reasonable juror to find him guilty beyond a reasonable doubt. *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005). After an independent review of the record, the Court concludes that Petitioner does not meet these standards here.

### B. Claims Four and Five (Merits)

The Court considers claims four and five on the merits.

#### 1. Claim Four

In claim four, Petitioner asserts that the evidence is constitutionally insufficient to sustain his conviction on aggravated murder, and that this conviction is against the manifest weight of the evidence.

The latter issue does not provide a basis for federal habeas corpus relief. A federal court may issue a writ of habeas corpus on behalf of a person in custody pursuant to the decision of a state court only if his custody is in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Thus, "[a] federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). A manifest weight of the evidence claim is an alleged error of state law that is not cognizable in this Court. Under Ohio law,

"[w]eight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other....'" *State v. Thompson*, 78 Ohio St.3d 380, 386 (1997) (citations omitted). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* A federal habeas court, however, may not "reweigh the evidence or re-determine the credibility of the witnesses whose demeanor has been observed by the trial court" because, in habeas proceedings, "[i]t is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citations omitted). Because this federal habeas court does not function as an additional state appellate court vested with the authority to conduct such an exhaustive review, Petitioner's claim that his conviction was against the manifest weight of the evidence cannot be considered by this Court.

Further, Respondent contends that Petitioner has procedurally defaulted his claim that the evidence is constitutionally insufficient to sustain his conviction on aggravated murder by failing to raise the issue in the state appellate court, where Petitioner argued solely that this conviction was against the manifest weight of the evidence. *See Appellant's Brief*, (Doc. 6-1, PageID# 110, 118-121)[2]. However, the United States Court of Appeals for the Sixth Circuit has held that a claim of insufficiency of the evidence may be preserved for federal habeas corpus review even if it is raised in the state courts solely in the context of a claim that the conviction is against the

---

[2] Petitioner did present a claim of insufficiency of the evidence to the Ohio Supreme Court; however, the Ohio Supreme Court does not ordinarily consider claims that were not raised in the appellate court below. *See Glenn v. Bobby*, No. 1:13-cv-128, 2013 WL 3421888, at *10 (N.D. Ohio July 8, 2013) ("[U]nder Ohio law a criminal constitutional question cannot ordinarily be raised in the Ohio Supreme Court unless it is first presented in the court below.") (citing *State v. Jester*, 32 Ohio St.3d 147, 154 (1987)).

manifest weight of the evidence. *See Nash v. Eberlin*, 258 F. App'x 761, 2007 WL 4438008, at

*3 (6th Cir. 2007). The Sixth Circuit reasoned:

> [T]he sufficiency of the evidence issue was adequately passed upon by the Ohio courts because the determination by the Ohio Court of Appeals that the conviction was supported by the manifest weight of the evidence necessarily implies a finding that there was sufficient evidence. The Ohio Court of Appeals, for instance, has explained that "'[b]ecause sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency.' Thus, a determination that a conviction is supported by the weight evidence will also be dispositive of the issue of sufficiency." *State v. Lee*, 158 Ohio App.3d 129, 814 N.E.2d 112, 115 (2004) (citations omitted). Therefore, the district court properly entertained Nash's sufficiency of the evidence claim because it has been effectively presented to the Ohio courts and was decided by the Ohio Court of Appeals.

*Id.* at 765; *see also Bryant v. Turner*, No. 2:15-cv-02929, at *4–5 (S.D. Ohio Oct. 12, 2016)

(citing *Taylor v. Brunsman*, No. 3:12CV800, 2014 WL 4113320, at *14 (N.D. Ohio Aug. 20,

2014) ("[W]hen a federal *pro se* habeas litigant makes a manifest weight of the evidence claim,

after presentment and adjudication in the Ohio courts, a rule of lenient construction of pro se

pleadings applies to construe the manifest weight claim as a sufficiency of the evidence claim....

because under Ohio law a finding that a conviction is supported by the manifest weight of the

evidence necessarily means that it has the support of sufficient evidence.") (footnotes omitted)

(citing *Nash*, 258 F. App'x at 761); *Johnson v. Warden, Lebanon Corr. Inst.*, No. 1:13-cv-82,

2014 WL 4829592, at *24 (S.D. Ohio Sept. 29, 2014) (same) (citing *Nash*, 258 F. App'x. at 764–

65; *Taylor v. Brunsman*, No. 3:12cv800, 2014 WL 4113320, at *1, *14 (N.D. Ohio Aug. 20,

2014); *Crawford v. Moore*, No. 3:14cv22, 2014 WL 293868, at *8 (S.D. Ohio Jan. 27, 2014)

(Merz, M.J.) (*Report & Recommendation*) (and cases cited therein), *adopted,* 2014 WL 2200685

(S.D. Ohio May 27, 2014) (Rose, J.); *Jones v. Cook*, No. 2:12cv125, 2012 WL 5467528, at *8

(S.D. Ohio Nov. 9, 2012) (Abel, M.J.) (*Report & Recommendation*) (and cases cited therein), *adopted*, 2012 WL 6472953 (S.D. Ohio Dec. 13, 2012) (Watson, J.)). This Court therefore will consider the merits of Petitioner's claim that the evidence is constitutionally insufficient to sustain his aggravated murder conviction.

The state appellate court rejected Petitioner's claim that his aggravated murder conviction was against the manifest weight of the evidence in relevant part as follows:

> Hively argues that the manifest weight of the evidence supported the conclusion that the shooting in this case was a spontaneous, tragic eruption of events and did not support a conviction for Aggravated Murder. Hively adds that BCI Agent Trout summarized it best by stating, in his interview with Hively, that the incident occurred because Hively reached a breaking point with the boys and shot Addis. Hively explains that while it may be murder, it is not aggravated murder. It is Hively's contention that he did not shoot Addis with prior calculation and design.

> Hively's argument here focuses on the prior calculation and design element of the charge of Aggravated Murder. Admittedly, Hively lists three things upon which the jury could have found evidence of prior calculation and design: 1) Hively knew Charles Addis 2) Hively believed Charles Addis was causing trouble on his property, and 3) Hively shot Charles Addis four times with a handgun. Hively, however, points out that the jury overlooked more evidence which supports that Hively did not meet the prior calculation and design element. This evidence was 1) this event was an unplanned encounter 2) the location was not chosen by Hively 3) it was broad daylight 4) two witnesses were present for the entire incident 5) Knepper had a cell phone in his hand 6) Hively believed he was taking photos with said cell phone 7) Addis and Knepper were aggressively yelling at Hively 8) Hively remained near his car when Addis and Knepper approached him 9) the incident was not drawn out and lastly 10) Hively did not leave the scene of the shooting.

> \* \* \*

> Hively was convicted of Aggravated Murder, in violation of R.C. 2903.01(A), which states: "No person shall purposely, and with prior calculation and design, cause the death of another \* \* \*." "No bright-line test exists that 'emphatically distinguishes between the

presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial.'" *State v. Maxwell*, 139 Ohio St.3d 12, 9 N.E.3d 930, 2014–Ohio–1019 quoting *State v. Taylor*, 78 Ohio St.3d 15, 20, 676 N.E.2d 82 (1997). "The apparent intention of the General Assembly in employing [the phrase 'prior calculation and design'] was to require more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill. Thus, instantaneous deliberation is not sufficient to constitute 'prior calculation and design.'" *State v. Cotton*, 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190 (1978).

In *State v. Jenkins*, 48 Ohio App.2d at 102, 2 O.O.3d at 75, 355 N.E.2d at 828, the court of appeals found three factors important in determining whether prior calculation and design exists: (1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events'?" *Taylor* at 19.

In contrast, Ohio courts have, at times, upheld findings of prior calculation and design in short, explosive situations. *Id*. For example, in *State v. Robbins*, 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755 (1979), appellant-defendant and decedent were drinking at appellant's apartment when appellant asked decedent to go pick up some food. *Id*. at 74. When decedent returned after using appellant's money to buy just alcohol, an argument ensued. *Id*. at 75. Appellant-defendant struck decedent, went back into his apartment and retrieved a sword from under his bed. Appellant-defendant went outside his apartment and stabbed the decedent. *Id.* The Ohio Supreme Court stated that the evidence established: " * * * that appellant used extreme aggression against a helpless victim, then leaving the victim in the hallway and returning to his apartment to secure the weapon which he used to stab the victim to death instants later." *Id*. at 78–9. The Court found the evidence to be sufficient to support the jury's finding of prior calculation and design. *Id.* at 79.

A different scenario is presented in *State v. Davis*, 8 Ohio App.3d 205, 8 OBR 276, 456 N.E.2d 1256 (1982), the Eighth District Court of Appeals overturned a jury's conviction of aggravated murder on the basis that the facts did not support the finding of prior calculation and design. In *Davis*, the appellant-defendant was refused entry into a bar because he did not have his identification.

*Id*. at 206. The bar doorman and appellant-defendant got into a verbal argument. *Id*. The bar owner and another patron joined in the confrontation and it evolved into physical confrontation. *Id*. Appellant-defendant fired three shots from a gun he had in his pocket at the time, injuring the doorman and causing the death of the bar owner. *Id*. The Court concluded:

We agree with defendant's contention that the evidence does not support a finding that defendant killed the owner of the bar with prior calculation and design. Defendant did not go to the bar with the intent of shooting either of these two men. Rather, defendant went to the bar "to have a good time" but was refused admittance. After defendant demanded entrance, verbal threats grew into a physical confrontation between defendant and the three persons within the bar. Defendant did not reach for his gun in his pocket until he was outnumbered and getting the worse of their treatment. No evidence was presented which demonstrated a previous strained relationship between defendant and the doorman or the bar owner. The mere fact that defendant was carrying a gun on this occasion but was not carrying a gun on some earlier visit to a different bar is not sufficient to demonstrate a prior calculation and design to kill someone at this bar. *Id*. at 207.

. . . It is certain that Hively had prior history with Addis, Knepper and Aaron Addis. Hively admitted to having slapped Knepper before and discussed with Agent Trout that he suspected the boys of being involved with past thefts on his property. It is also clear, that Hively intended to have a confrontation, at the very least verbally, with the three men when he turned his car around and headed back their way. Knepper and Aaron Addis both testified that Hively showed his gun to the boys at the beginning of the incident. Knepper makes reference to the gun in the beginning of the cell phone video.

The cell phone video captures various moments where Hively would be in the face of Addis or Knepper and even a moment when the confrontation seemed to deescalate. The second half of the video though shows Hively had returned to his car. Now, something was in his right hand behind his back. Hively raised and showed his empty left hand while Knepper continued to tell Hively to show him the gun. Apparently, Hively was holding his gun behind his back at that point. Hively and Addis look at each other and have the following conversation:

Hively: "What was you going for?"

Addis: "What?"

Hively: "Dick sucker, what was you going for?"

Knepper's recording turns back towards the church, causing Hively and Addis to be out of view for about two seconds. The audio of the video recording captures two gunshots. Knepper directs the camera back and reveals Hively standing over Addis, still pointing a gun at him as he lays on the ground writhing in pain. Hively fires another shot at Addis. The coroner who performed the autopsy testified that Addis had been shot four times.

In the interview with Agent Trout, Hively stated that he was not going to back down and that he wanted to whip Addis. A history existed between the parties involved in this confrontation. Hively wanted, at the very least, a verbal confrontation with Addis, Knepper, and Aaron Addis. Although the interaction was heated at times, no spontaneous eruption of events occurred until Hively pulled his gun from behind his back and shot Addis twice. Then after Addis lay on the ground, Hively shoots Addis at least two more times. The jury duly charged with deciding this case found that Hively acted with the required prior calculation and design. Considering these facts, we do not find that the jury clearly lost its way in convicting Hively of Aggravated Murder. Additionally we do not find that the evidence "weighs heavily against the conviction." *Davis*, 2013–Ohio–1504, at ¶ 15. Therefore, the second assignment of error is overruled.

*State v. Hively*, 2015 WL 3745609, at *7–8.[3]

---

[3] Judge Harsha issued a dissenting opinion, as follows:

HARSHA, J., dissenting.

I conclude the jury lost its way when it found the state had proved the element of prior calculation and design beyond a reasonable doubt. The record reveals that a "plan" to murder Addis did not develop until the confrontation escalated. Although Hively may have been willing to kill Addis prior to shooting him, there is little concrete evidence that Hively had already decided to murder one of the three men when he stopped at the church. Rather, the confrontation was a chance occurrence, not at a location Hively chose. It occurred during broad daylight, in front of two witnesses, who Hively supposedly believed were involved in the theft that sparked the incident, yet they remained unharmed. Hively knew one of the witnesses had a cell phone and thought he was taking pictures. And the decedent and one of the eyewitnesses were aggressively confronting Hively.

Based upon this evidence I conclude the jury lost its way and created a manifest miscarriage of justice when it failed to find Hively not guilty of aggravated murder, but guilty of murder.

*State v. Hively*, 2015 WL 3745609, at *10.

A claim of insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307 (1979). In order for a conviction to be constitutionally sound, every element of the crime must have been proven beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.... This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson*, 443 U.S. at 319; *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006); *see also State v. Jenks*, 61 Ohio St.3d 259 (1991) (applying rule). Of course, it is state law that determines the elements of an offense. Once the state has adopted the elements of the offense, the state must then prove each of those elements beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364.

Moreover, AEDPA requires two levels of deference to state decisions addressing a claim of sufficiency of the evidence: one to the trier of fact's verdict under *Jackson v. Virginia*, and a second to the appellate court's consideration of that verdict. *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008).

> We have made clear that Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, ——, 132 S.Ct. 2, 181 L.Ed.2d 311, 313 (2011) (per curiam). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court

> disagrees with the state court. The federal court instead may do so
> only if the state court decision was 'objectively unreasonable.'"
> *Ibid.* (quoting *Renico v. Lett*, 559 U.S. ——, ——, 130 S.Ct. 1855,
> 176 L.Ed.2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (*per curiam*); s*ee also Brown v. Konteh*, 567 F.3d

191, 205 (6th Cir. 2009).

Here, the state appellate court carefully analyzed the evidence both supporting and

undermining the conclusion that Petitioner acted with the required prior calculation and design.

In the final analysis, the court noted: the history between the parties; Petitioner's desire to have a

confrontation with the victim; at times, throughout the confrontation, the situation deescalated;

"no spontaneous eruption of events occurred until Petitioner pulled his gun from behind his back

and shot Addis twice"; and "after Addis lay on the ground, [Petitioner shot] Addis at least two

more times." *State v. Hively*, 2015 WL 3745609, at *8. Based on all of this, the court found that

"the jury [had not] clearly lost its way in convicting [Petitioner] of Aggravated Murder." *Id.*

Applying the double deference this Court must, the state appellate court did not err.

### 2. Claim Five

In claim five, Petitioner asserts that he was denied a fair trial because the trial court

refused to issue a jury instruction on the "castle doctrine" supporting his claim of self-defense.

The state appellate court rejected this claim, reasoning in relevant part:

> Hively argues that the trial court erred when it denied his request
> for a castle doctrine jury instruction. Hively contends that his
> statements provide sufficient evidence to warrant the castle
> doctrine jury instruction. Hively states that after he was shoved
> back into his car and kicked in the face, he reached for his handgun
> that was in the car to repel the attack. Hively argues that sufficient
> evidence was provided to show that he was an occupant of his own
> vehicle, entitling him to the instruction regarding the castle
> doctrine. Hively contends that the trial court's denial of his request
> prejudiced him by "saddling him with a duty to retreat that Ohio

law has eliminated for a person lawfully occupying his own motor vehicle."

A trial court generally has broad discretion in deciding how to fashion jury instructions. *State v. Hamilton*, 4th Dist. Scioto No. 09CA3330, 2011–Ohio–2783, ¶ 69. However, "a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. "Additionally, a trial court may not omit a requested instruction, if such instruction is 'a correct, pertinent statement of the law and [is] appropriate to the facts * * *.'" [Alteration sic.] Hamilton at ¶ 69, quoting *Smith v. Redecker*, 4th Dist. Athens No. 08CA33, 2010–Ohio–505, ¶ 51, in turn quoting *State v. Lessin*, 67 Ohio St.3d 487, 493, 620 N.E.2d 72 (1993).

"'In determining whether to give a requested jury instruction, a trial court may inquire into the sufficiency of the evidence to support the requested instruction.'" *Hamilton* at ¶ 70, quoting *Redecker* at ¶ 52; *see also Lessin* at 494. Therefore, a trial court is vested with discretion "to determine whether the evidence is sufficient to require a jury instruction * * *." *State v. Mitts*, 81 Ohio St.3d 223, 228, 690 N.E.2d 522 (1998); *see also State v. Wolons*, 44 Ohio St.3d 64, 541 N.E.2d 443 (1989), paragraph two of the syllabus. "'If, however, the evidence does not warrant an instruction a trial court is not obligated to give the requested instruction.'" *Hamilton* at ¶ 70, quoting *Redecker* at ¶ 52. Thus, "'we must determine whether the trial court abused its discretion by finding that the evidence was insufficient to support the requested charge.'" *Id*. The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

To establish a claim of self-defense, a defendant generally must show by a preponderance of the evidence that (1) he or she was not at fault in creating the situation giving rise to the event, (2) he or she had reasonable grounds to believe and an honest belief that he or she was in imminent danger of death or great bodily harm and that the only means of escape from such danger was by the use of force, and (3) he or she did not violate any duty to retreat or avoid the danger. *State v. Goff*, 4th Dist. Lawrence No. 11CA20, 2013–Ohio–42, ¶ 17.

Here, Hively requested the jury instruction pursuant to R.C. 2901.05(B)(1). This instruction, also referred to as the "Castle

Doctrine," relieves the defendant's burden to prove the foregoing three elements. "Under R.C. 2901.05(B), a defendant is rebuttably presumed to have acted in self-defense 'when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence or vehicle occupied by the person using the defensive force.'"

*State v. Bundy*, 4th Dist. Pike No. 11CA818, 2012–Ohio–3934, ¶ 38.

This rebuttable presumption means that the defendant no longer carries the initial burden to produce evidence that (1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger. Instead, the rebuttable presumption, by definition, presumes the existence of these facts. *Id.*

For the presumption to apply, a defendant must establish that (1) the person against whom the defendant used defensive force was in the process of unlawfully entering, or had unlawfully entered, the residence or vehicle that the defendant occupied, (2) the defendant was in the vehicle lawfully, and (3) the victim did not have a right to be in the vehicle. If the presumption applies, the state may rebut it. R.C. 2901.05(B)(3); *State v. Wilson*, 8th Dist. No. 97350, 2012–Ohio–1952, 2012 WL 1567202, ¶ 43 (construing complementary statute, R.C. 2901.09(B), the no-duty-to-retreat statute); *State v. Petrone,* 5th Dist. No.2011CA67, 2012–Ohio–911, ¶ 73 (recognizing that state may rebut presumption by showing that defendant was at fault and did not have a bona fide belief that defendant was in imminent danger and that the only means of escape was use of force).

The trial court denied Hively's request for the Castle Doctrine jury instruction stating: "Although the defendant was originally in his vehicle when he pulled up to the scene, he then exited the vehicle. Furthermore there is no evidence that the victim tried to enter the vehicle at any time, much less while the defendant was in the vehicle. However, the Court is going to give an instruction on self defense as agreed upon by the parties."

R.C. 2901.05(B)(1) contemplates a scenario of a home or car invasion. *State v. Nye*, 3rd Dist. Seneca No. 13–13–05, 2013–Ohio–3783, 997 N.E.2d 552, ¶ 29. The rebuttable presumption in R.C. 2901.05(B)(1) does not apply when the person using defensive force in not occupying his/her vehicle. *State v. Miller*, 12th Dist. Warren No. CA2009–10–138, 2010–Ohio–3821, ¶ 38; *Patrone*, 2012–Ohio–911 at ¶ 73.

Here, the altercation and shooting took place outside Hively's vehicle. Moments before the shooting it is clear that Hively was standing beside his vehicle's open door, with Addis approximately a few feet away. All the spent shell casings were found outside Hively's vehicle. There is no doubt that Knepper and Addis were threatening and taunting Hively throughout this altercation. However, while it remains Hively's story that he was shoved back into his car, no other evidence supports the conclusion that Knepper or Addis attempted to enter Hively's vehicle. Therefore, we cannot find that the trial court abused its discretion when it denied Hively's request for the R.C. 2901.05 instruction. Accordingly, Hively's first assignment of error is overruled.

*State v. Hively*, 2015 WL 3745609, at *5–7.

"[A]lleged errors in jury instructions are generally considered matters of state law and are not cognizable in federal habeas review." *Bushner v. Larose*, No. 5:14-cv-00385, 2017 WL 1199160, at *10 (N.D. Ohio Mar. 31, 2017) (citing *Sutton v. Lazaroff*, No. 3:13-cv-2304, 2015 WL 5178022, at *16 (N.D. Ohio Sept. 4, 2015).

Alleged errors in jury instructions normally do not rise to the level of federal constitutional violations. *See Engle v. Isaac*, 456 U.S. 107 (1982); *Turoso v. Cleveland Municipal Court*, 674 F.2d 486 (6th Cir. 1982); *Eberhardt v. Bordenkircher*, 605 F.2d 275 (6th Cir. 1979); *Weston v. Rose*, 527 F.2d 524 (6th Cir. 1975). When the evidence presented does not support a requested jury instruction and that determination is based upon a state court's interpretation and application of state law, an asserted error relating to the jury instruction is not cognizable in federal habeas corpus unless the failure amounted to a fundamental miscarriage of justice. *See Bagby v. Sowders*, 894 F.2d 792, 795 (6th Cir. 1990).

*Waller v. Tibbals*, No. 3:15-cv-310, 2016 WL 3906234, at *10 (S.D. Ohio July 19, 2016) (concluding that Petitioner's claim regarding the trial court's failure to issue a castle doctrine

jury instruction is not cognizable in federal habeas corpus proceedings). (Petitioner has failed to establish that the state appellate court contravened or unreasonably applied clearly established federal law as determined by the United States Supreme Court, or based its decision on an unreasonable determination of the facts in light of the evidence presented so as to warrant relief. 28 U.S.C. 2254(d).) Put simply, this claim involves the application of state law and does not provide a basis for relief. *See id.*

## IV.     RECOMMENDED DISPOSITION

Therefore, the Magistrate Judge **RECOMMENDS** that the Petition be **DENIED**, and this action be **DISMISSED**.

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(B)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

IT IS SO ORDERED.

Date: February 5, 2018

/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE